IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

DONALD BIBB;
MARQUES H. HARRIS;
RICK JOSEPH COLOMBO;
LOREN WILLIAMS;
KEN JORGENSEN; and
DOUGLAS B. PACE

      Plaintiff(s)

v.

SOUTHERN CONCEPTS RESTAURANT GROUP, INC., a Colorado corporation as the surviving entity of Southern Hospitality Development Corporation,  Smokin Concepts Development Corporation, and Bourbon Brothers Holding Corporation, BOURBON BROTHERS INVESTORS, LLC, a Colorado limited liability company, BOURBON BROTHERS # 14, LLC, a Colorado limited liability company, BOURBON BROTHERS, LLC, a Colorado limited liability company, and AMHC MANAGED SERVICES, INC., a Colorado corporation.

      Defendants.

---

## COMPLAINT

---

      Plaintiffs, by and through their attorneys, DLG Law Group LLC, allege the following facts in support of this complaint ("Complaint"). Except as to allegations specifically pertaining to Plaintiffs and their counsel, which are based upon personal knowledge, the allegations are made at this time upon information and belief, based upon investigation undertaken by, and under the supervision of, Plaintiffs' counsel. Plaintiffs believe further evidentiary support for the Plaintiffs' claims will be adduced in discovery.

## I.  SUMMARY

1.     This is an action by shareholders who invested in Southern Concepts Restaurant

Group, Inc. ("SCRG")., or one of its predecessors which were Southern Hospitality Development

Company ("SHDC"), Smokin' Concepts Development Corp. ("SCDC") and Bourbon Brothers

Holding Corporation ("BBHC") (hereinafter referred to collectively as "Defendants") between

January 1, 2012, and the date of this filing, for violations of the Federal and State Securities

Laws, as well as common law and statutory violations.

2.     Defendants, through their officers and directors, and through other entities who

eventually were merged into or became part of SCRG, engaged in a series of complex corporate

formations and reformations in order to hide their utter lack of success in the restaurant business,

so they could entice further investment in their companies. Defendants through their officers and

directors repeatedly misled Plaintiffs in order to induce further investments in the applicable

Defendant by misrepresenting the state of financials that were used to induce sales of stock. The

applicable Defendants benefited from their fraud at the expense of Plaintiffs, and hundreds of

other investors. This action seeks recovery from SCRG as the surviving entity for Plaintiffs

losses due to their illegal activities. The action also seeks recovery from Bourbon Brothers

Investors, LLC ("BBI") who conspired with SCRG to divert funds to land that it owned which

used SCRG funds to make payments.

## II. JURISDICTION AND VENUE

3.     This Court has jurisdiction over this action pursuant to Section 22(a) of the

Securities Act of 1933 (the "Securities Act") and Section 27 of the1934 Securities Exchange Act

(the "Exchange Act").

4.     Venue in this District is proper pursuant to Section 22(a) of the Securities Act (15

U.S.C. §77v(a)) and Section 27 of the Exchange Act (15 U.S.C. §78aa) because the defendants

transact business in Denver, and a substantial portion of the conduct alleged in this Complaint occurred in Denver.

5.      In connection with the acts and conduct alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate wire and telephone communications.

### III. PARTIES

6.      Plaintiff Donald Bibb is an individual and citizen of the state of Colorado and was a shareholder at all times pertinent to the complained of transactions.

7.      Plaintiff Marques H. Harris is an individual and citizen of the state of Colorado and was a shareholder at all times pertinent to the complained of transactions.

8.      Plaintiff Rick Joseph Colombo is an individual and citizen of the state of Colorado and was a shareholder at all times pertinent to the complained of transactions.

9.      Plaintiff Loren Williams is an individual and citizen of the state of Colorado and was a shareholder at all times pertinent to the complained of transactions.

10.     Plaintiff Ken Jorgensen is an individual and citizen of the state of Colorado and was a shareholder at all times pertinent to the complained of transactions.

11.     Plaintiff Douglas B. Pace is an individual and citizen of the state of Colorado and was a shareholder at all times pertinent to the complained of transactions.

12.     Southern Concepts Restaurant Group, Inc. is a company incorporated in the state of Colorado, with its last known principal place of business located at 1830 Jet Stream Drive, Colorado Springs, CO 80921. Southern Concepts Restaurant Group, Inc. may be served with process at the same location as its principal place of business and is the surviving entity of

Southern Hospitality Development Company, Smokin' Concepts Development Corp, and

Bourbon Brothers Holding Corporation.

13.     Individuals whom were insiders of the company but are not defendants at this

time, are the actors who committed many if not all of the acts on behalf of the applicable

Defendants alleged herein, and are the subject of a derivative demand by Plaintiffs are as

follows:

    a.      JW Roth is an individual and was, at all times pertinent to this matter, a
    Founder, Director, Shareholder, and controlling person of Bourbon Brothers
    Holding Corporation and Southern Concepts Restaurant Group, Inc. As further
    alleged below, Defendant JW Roth used Bourbon Brothers Holding Corporation
    and Southern Concepts Restaurant Group, Inc. to perpetuate and protect a fraud
    committed on Plaintiffs.

    b.      David Lavigne is an individual and was, at all times pertinent to this
    matter, a Director and Shareholder of Bourbon Brothers Holding Corporation and
    Southern Concepts Restaurant Group, Inc. As further alleged below, Defendant
    Lavigne used Bourbon Brothers Holding Corporation and Southern Concepts
    Restaurant Group, Inc. to perpetuate and protect a fraud committed on Plaintiffs.

    c.      Mitchell Roth is an individual and was President, Chief Executive Officer,
    and a Director of Bourbon Brothers Holding Corporation from June 2014 until
    August 2016 when he resigned as Chief Executive Officer, however he retained
    his directorship. As further alleged below, Defendant Mitchell Roth used Bourbon
    Brothers Holding Corporation and Southern Concepts Restaurant Group, Inc. to
    perpetuate and protect a fraud committed on Plaintiffs.

d.      Robert Mudd is an individual and served as interim Chief Executive Officer, Chief Financial Officer, and Chairman of the Board beginning in June 2013. In January 2014, he is appointed permanently to these positions. As further alleged below, Defendant Mudd used Bourbon Brothers Holding Corporation and Southern Concepts Restaurant Group, Inc. to perpetuate and protect a fraud committed on Plaintiffs.

e.      Shawn Owen is an individual and served as Chief Operating Officer beginning in March 2014 through August 2016. As further alleged below, Defendant Owen, during his tenure as Chief Operating Officer, used Bourbon Brothers Holding Corporation and Southern Concepts Restaurant Group, Inc. to perpetuate and protect a fraud committed on Plaintiffs.

f.      Heather Atkinson is an individual and served as Chief Financial Officer, Secretary, and Treasurer beginning in January 2014. As further alleged below, Defendant Atkinson, used Bourbon Brothers Holding Corporation and Southern Concepts Restaurant Group, Inc. to perpetuate and protect a fraud committed on Plaintiffs.

g.      James Fenlason is an individual and served as a Director beginning in June 2014. As further alleged below, during his tenure, Defendant Fenlason used Bourbon Brothers Holding Corporation and Southern Concepts Restaurant Group, Inc. to perpetuate and protect a fraud committed on Plaintiffs.

h.      Richard Stewart is an individual and served as a Director beginning in March 2014. As further alleged below, during his tenure, Defendant Stewart used

Bourbon Brothers Holding Corporation and Southern Concepts Restaurant Group, Inc. to perpetuate and protect a fraud committed on Plaintiffs.

i.      Gerry Tedder is an individual and served as President of Southern Hospitality Development Corporation. As further alleged below, during his tenure, Defendant Tedder used Bourbon Brothers Holding Corporation and Southern Concepts Restaurant Group, Inc. to perpetuate and protect a fraud committed on Plaintiffs.

## IV. FACTS

14.      In November 2011, Southern Hospitality Franchisee Holding Corporation (hereinafter "SHFHC") entered into an Area Developer Agreement ("ADA") and a Franchise Agreement ("FA") with Southern Hospitality Franchising & Licensing LLC ("Franchisor") – which was owned by SHFHC - for the exclusive rights for the first 10 cities identified in the ADA, subject to customary conditions and exceptions, and for the ownership and operation of up to 30 Southern Hospitality Restaurants in the United States.

15.      In November 2012, Art Dimensions Inc., a public shell company, merged with and into SHDC. After that, SHDC acquired SHFHC. Steve Cominsky, Gary Tedder, J.W. Roth, and David Lavigne replaced the previous directors of SHDC and SHDC then changed directions from what Art Dimensions Inc. had done and entered the hospitality/restaurant industry.

16.      Effective September 1, 2011, SHFHC entered into a management agreement (the "Management Agreement") with AMHC Managed Services Inc. ("AMHC"). The Management Agreement was then renewed by SHDC.  J.W. Roth and David Lavigne were the controlling persons of AMHC. SHDC issued two separate warrants to AMHC to purchase 500 shares of stock per warrant. Both warrants were exercised by AMHC prior to the closing of the

6

Acquisition of SHFC, making AMHC a significant shareholder of SHDC. SHDC paid AMHC $140,000 in 2011 and $315,000 (through September 30) in 2012 for management services while AMHC was a significant shareholder of SHDC.

17.     In November 2012, SHDC announced a press release and filed an 8K with the SEC related to the merger with Art Dimensions Inc, explaining the SHDC organizational chart.

18.     On or about November 24, 2012, SHDC offered and sold $5,311,720 of stock to 89 total investors, including 4 non-accredited investors.

19.     In or around December 2012, SHDC gave presentations to potential investors. The presentations focused heavily on the Company's celebrity co-creators, Justin Timberlake and Ryan Tedder, with bold statements of how their social media capital would benefit the Company. The presentation included photographs of Justin Timberlake, Jessica Biel, and Elton John and stated: "Southern Hospitality Will Receive Extensive Amounts of Media Exposure," "Justin is one of the most recognized celebrities in the world, ", "Justin Timberlake is anticipated to appear in person at the opening of the first couple of new stores, as will co-creator Ryan Tedder," and "We will use the power of social media via the many followers our celebrity associates (local and national) have in their various social media venues."

20.     On or about December 18, 2012, SHDC offered and sold $15,000 to a total of one investor based on the presentations made to investors as stated in Paragraph 18.

21.     On March 21, 2013, Gary Tedder, President of SHDC, sent the shareholders of SHDC a letter describing SHDCs plans to enter a new management contract with Bourbon Brothers LLC, a privately held company, replacing AMHC for the purpose of providing operations and management services in exchange for a percentage of gross revenue.  The letter stated the directors' intent to follow the original roll out schedule for SHDC to add new

restaurants and stated: "This structure allows SHDC to develop a new revenue stream that is both riskless and non-dilutive to our shareholders." Upon information and belief, the contract Bourbon Brothers LLC was entered into but not approved by disinterested directors or shareholders of SHDC.

22.     In April 2013, SHDC issued an investor presentation stating all financial projections were in-line or tracked favorably with proforma expectations.

23.     In May 2013, SHDC changed its name again to Smokin' Concepts Development Corporation ("SCDC").

24.     In May 2013, JW Roth and David Lavigne resigned as Director and Chairman of SCDC, and Steve Cominsky was appointed SCDC/SHDC's Chief Financial Officer. Cominsky also continued as Chief Executive Officer and a Director of SCDC/SHDC.

25.     In May 2013, Bourbon Brothers Holding Company, LLC ("BBLLC"), a separate entity from SHDC/SCDC, was formed and a private placement offering was made. Class B non-voting membership interest units were offered which would later be converted into Class A shares. These shares were sold to investors.

26.     In June 2013, Steve Cominsky resigned as CEO, CFO  and Director of SCDC/SHDC and Robert Mudd was appointed as interim CEO, CFO, and Chairman of the Board to replace Cominsky.

27.     In September 2013, SCDC/SHDC entered into an acquisition agreement with BBLLC in which they acquired all the assets of BBLLC. The transaction was closed in January 2014, after several amendments to the acquisition agreement.

28.     In January 2014, a change of control occurred and JW Roth was appointed Chairman of the Board, Robert B. Mudd was appointed President and Chief Executive Officer,

and Heather Atkinson was appointed Chief Financial Officer, Secretary, and Treasurer of SCDC/SHDC. With the change of control, the Company authorized an increase to 100,000,000 shares of common stock and 18,242,700 shares of preferred stock. The name of SCDC/SHDC was changed to Bourbon Brothers Holding Corporation ("BBHC"), a different entity from BBLLC.

29.     On information and belief, the shareholders of SHDC, became shareholders of SCDC. In addition, on information and belief, the shareholders of BBLLC became shareholders of SCDC. When SCDC changed their name to BBHC, the shareholders of SCDC became shareholders of BBHC.

30.     In February 2014, BBHC offered and sold $13,480,908 worth of stock to a total of 81 investors, including 6 non-accredited investors.

31.     In March 2014, BBHC appointed Shawn Owen as COO, David Lavigne as Director and Richard Stewart as Director. Robert Mudd resigned as CEO and President.

32.     Also in March 2014, BBHC sold $275,000 worth of stock to three investors.

33.     In June 2014, James Fenlason was appointed Director and Mitchell Roth was appointed President of BBHC. Mitchell Roth is JW Roth's 25-year-old son, and his most significant work experience at the time was an internship he completed with his Father's company.

34.     Also, in June 2014, BBHC, through two separate stock offerings, sold $650,300 and $77,000 worth of stock to a total of 13 investors, including 5 non-accredited investors.

35.     In August 2014, BBHC sold $200,000 worth of stock to 1 investor.

36.     In December 2014, BBHC, sold $50,000 worth of stock to 2 investors.

37.     Also, in December 2014, JW Roth sent two emails discussing erratic changes in the stock price of BBHC. JW Roth stated that the changes in stock price were "irrelevant in the absence of volume." This statement is misleading to investors because without volume the dramatic price swings would not have occurred.

38.     In December 2014, BBHC entered into a loan agreement for the principal amount of $1,250,000 with an interest rate of either the greater of 9.25% or 6.25%, plus the prime rate, with Bourbon Brothers #14, LLC. Bourbon Brothers #14, LLC was owned by JW Roth, David Lavigne, Richard Stewart, and Heather Atkinson, all of whom were associated with BBHC. The transaction was not approved by disinterested directors, as there were none, or disinterested shareholders. In essence, the directors and executives of BBHC loaned money to themselves through a separate entity controlled by them in order to get access to 7,500,000 shares through warrants that were issued to JW Roth for obtaining the financing, from himself.

39.     In February 2015, Robert Mudd began soliciting pro-rata investment into Bourbon Brothers, LLC a wholly owned subsidiary of BBHC. Mudd promised Plaintiff Ken Jorgensen he would receive a pro-rata share of the 3,600,000 membership units offered. However, those units were never received.

40.     In March of 2015, the BBHC name was changed yet again to Southern Concepts Restaurant Group, Inc ("SCRG"). The authorized common shares were also increased from 100,000,000 to 120,000,000 shares.

41.     In March 2015, SCRG. (formerly, Bourbon Brothers Holding Corporation) sold $50,000 worth of stock to 1 investor.

42.     In November 2015, SCRG sold $25,000 of stock to 1 investor.

43.     In December 2015, SCRG. sold $175,000 of stock to 3 investors.

44.     On June 19, 2017, SCRG filed a Form 8-K stating: "The Company will be closing its three restaurants and ceasing operations effective June 19, 2017.The three restaurants were then abruptly closed.

## V. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**(Fraud Against Defendants)**

45.     Plaintiffs incorporate by reference the allegations in all other paragraphs.

46.     Defendants engaged in a fraudulent scheme to induce investment in the Defendants and misrepresented several material facts in connection with securities offerings.

47.     Beginning in or around 2012, Defendants began presenting the concept of Southern Hospitality restaurants to investors. One presentation falsely and fraudulently stated: "Southern Hospitality Will Receive Extensive Amounts of Media Exposure," and included photographs of celebrities Justin Timberlake, Elton John, and Jessica Biel. The presentation also stated: "We will utilize the power of social media via the many followers that our celebrity associates (local and national) have in their various media venues" and "A hint of celebrity beneath the surface will drive a leveraged social media marketing strategy." Finally, the presentation stated: "Southern Hospitality restaurants will feature local entertainers and occasional visits by one of our celebrity co-creators."

48.     These representations regarding celebrity marketing were material because they induced Plaintiffs to purchase shares in the Defendants by creating the misleading impression of extensive celebrity involvement with the Colorado restaurants, and by falsely claiming that the restaurants would receive valuable media exposure and marketing from celebrities.

49.     The representations made by Defendants were in fact false. The true facts were as follows: the Defendant entities were a new start-up with absolutely no guarantee of social media marketing on behalf of its celebrity co-creators. While Justin Timberlake was a co-creator of the concept of Southern Hospitality, he was neither an investor nor a shareholder, and therefore had no economic incentive to promote the Colorado restaurants. The celebrity co-creators did not, in fact, market the Colorado restaurants through social media on Twitter, Facebook, or any other social media platform. There is also no evidence that Justin Timberlake or Ryan Tedder attended the openings of any of the Colorado restaurants or performed at the Colorado Restaurants.

50.     When the applicable Defendants made the misrepresentations regarding celebrity promotion of the restaurants, Defendants knew them to be false. Defendants had no guarantee that the celebrities would be involved in promotion and marketing, and had no way of knowing whether the restaurants would receive celebrity media exposure. These representations were made by Defendants with the intent to defraud and deceive Plaintiffs into purchasing shares in the Defendant entities. The applicable Defendants made the false representations of fact with the intent that Plaintiffs and others rely on representations when making the decision to purchase stock.

51.     Plaintiffs, at the time the statements were made and at the time Plaintiffs took the actions herein alleged, had no way of knowing the true nature of the relationship between any of the Defendants and Justin Timberlake and Ryan Tedder. Plaintiffs also had no way of knowing whether the applicable Defendants' statements regarding its "celebrity co-creators" were true, and could not discover the veracity of any of the Defendants' representations regarding celebrity marketing with due diligence. Therefore, Plaintiffs justifiably relied on any and all of the

Defendants' misrepresentations regarding celebrity marketing. As a result, Plaintiffs have been damaged in an amount to be proven at trial.

52.     On March 21, 2013, Gary Tedder sent an email to the shareholders of SHDC regarding the Company's management contract with an unspecified Bourbon Brothers entity which was impossible to identify because of the numerous Bourbon Brothers entities, whereby SHDC would issue equity in exchange for management services. The email falsely and fraudulently stating: "This structure allows SHDC to develop a new revenue stream that is both riskless and non-dilutive to our shareholders."

53.     The statement was material because it may have induced Plaintiffs to invest or retain their shares of SHDC stock based on the misrepresentation that the SHDC management contract with the unspecified BB entity, in exchange for a percentage of gross revenue, was "riskless" and would not dilute their shares.

54.     The representations made by the applicable Defendants were in fact false. The issuance of large portions of equity in exchange for management services necessarily involves a significant risk of dilution. There was no guarantee that any of the stock issued would be repurchased.

55.     At the time, the applicable Defendants knew the statement to be false. Plaintiffs, at the time the statement was made, were ignorant of the amount of equity being provided to the unspecified Bourbon Brothers entity in exchange for management services, and therefore had no way of knowing whether the transaction structure was in fact "riskless" and non-dilutive of their stock interests. Plaintiffs justifiably relied on the applicable Defendants' misrepresentations.

56.     As a result, Plaintiffs have been damaged in an amount to be proven at trial.

57.     In or around September 2013, oral representations were made to Plaintiffs that BBHC had an ownership interest in "Lot 13," the real property in Colorado Springs leased for the Bourbon Brothers Smokehouse and Tavern restaurant (BBCS), and that funds solicited from investors would be used to pay off the lease, with BBHC subsequently owning the property. The subscription agreement dated May 20, 2013 also included a highly misleading diagram laying out the relationships between the multitude of Bourbon Brothers entities formed by Defendants (Bourbon Brothers Holding Company, Bourbon Brothers LLC, Bourbon Brothers Restaurant Group, Bourbon Brothers Franchise, LLC, Bourbon Brothers Brand LLC, Bourbon Brothers Smokehouse and Tavern LLC, Bourbon Brothers Smokehouse and Tavern Franchise Stores). The diagram featured Bourbon Brothers Holding Company at the top of the diagram making it appear as if BBHC had an interest in the entities beneath it, and therefore an interest in Lot 13.

58.     The misrepresentations were material because they induced Plaintiffs to purchase additional shares in the applicable Defendant entity based on the false and misleading impression the Defendants had an ownership interest in a valuable parcel of real property.

59.     The representations made by Defendants were in fact false. Shareholders of BBHC never had an ownership interest in Lot 13, despite assertions otherwise. Instead, the lot was owned by Bourbon Brothers Investors, LLC ("BBI"), a separate entity founded and controlled by the founders and directors of BBHC.  For clarification, BBI is not directly affiliated with SCRG or any of the preceding entities of SCRG (Ticker:  Ribs).  RIBS is a separate operating public company that is still in business.

60.     When the applicable Defendants represented that BBHC shareholders had an interest in the real property, they knew the statement to be false. Plaintiffs, at the time the representations were made and at the time Plaintiffs took the actions herein alleged, were

14

ignorant of the true ownership structure, in light of the dizzying array of entity formations and name changes and could not have discovered the falsity of the representations with due diligence. Therefore, Plaintiffs justifiably relied on Defendants' misrepresentations regarding the ownership of Lot 13 when purchasing or maintaining their shares. As a result, Plaintiffs have been damaged in an amount to be proven at trial.

61.     By reason of the fraudulent and otherwise wrongful manner in which the defendants obtained their alleged right, claim or interest in and to Lot 13, Defendants have no legal or equitable right, claim or interest in the property, but, instead, Defendants are involuntary trustees holding said property and profits therefrom in constructive trust for Plaintiffs with the duty to convey the same to Plaintiff forthwith.

62.     In or around December 2014, Tedder on behalf of the applicable Defendant falsely and fraudulently represented in emails to Plaintiff Ken Jorgensen: "No volume in stock till mid Nov. Don't expect any relevant movement till then. We don't even watch it, as it doesn't reflect true performance in a thinly traded stock." Tedder on behalf of the applicable Defendant also wrote: "Like I said at our meeting last week, until the stock finds volume price means nothing."

63.     The statements were material because they induced Plaintiffs to purchase additional shares of stock in BBHC because they believed that the drop-in price of the stock was meaningless.

64.     These statements were false and misleading because the dramatic price swings would not have occurred in the absence of volume.

65.     Tedder on behalf of the applicable Defendant made these to fraudulently appease Plaintiffs' concerns, and Tedder on behalf of the applicable Defendant intended that the statements be relied on by Plaintiffs.

66.     Plaintiffs were ignorant of the falsity of the Tedder misrepresentation on behalf of the applicable Defendant regarding the dramatic price swings, and justifiably relied on the misrepresentation. As a result, Plaintiffs have been damaged in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF
### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder)

67.     Plaintiffs incorporate by reference the allegations in all other paragraphs.

68.     The applicable Defendants, by engaging in the conduct set forth in paragraphs 45-66 above, and by engaging in the conduct set forth in this Complaint as a whole, carried out a plan, scheme and course of conduct which was intended to and, did: (1) deceive the investing public, including Plaintiffs as alleged herein; and (2) cause Plaintiffs to purchase shares in the various Defendant entities. In furtherance of this unlawful scheme, plan and course of conduct, each of the Defendants took the actions set forth herein.

69.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to solicit investments in the Company in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged in this Complaint.

70.     Defendants directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of the Company as specified herein.

71.     These Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Company's value and performance and continued growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about the Company and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Company's shares.

72.     The Defendants' primary liability, arises from the following facts: (1) the Defendants through their high-level executives, directors, and/or agents at the Company and members of the Company's management team had control of the stock; (2) the Defendants, by and through the activities of the senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's business prospects and operations; (3) the Defendants through their officers and directors used internal reports and other data and information about the Company's operations and business projects at all relevant times to fashion any and all of their representations whether true or not; and (4) the Defendants through their officers and directors were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

17

73.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the Company's failures in the restaurant industry and the financial risk of investing in the Company. As demonstrated by Defendants' misstatements of the Company's involvement with its celebrity co-creators, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

74.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, Plaintiffs were induced to purchase shares of the Company,  relying directly or indirectly on the false and misleading statements made by the applicable Defendants, or upon the integrity of the market in which Company trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants. Plaintiffs acquired shares of Company during the period at artificially high prices and were or will be damaged thereby.

75.     At the time of said misrepresentations and omissions, Plaintiffs were ignorant of their falsity and believed them to be true. Had Plaintiffs and the marketplace known the truth regarding the financial risks and failures of the Company, Plaintiffs would not have purchased or otherwise acquired their Company shares or, if they had acquired such securities, they would not have done so at the artificially inflated prices that they paid.

76.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

77.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

78.     This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of securities giving rise to the cause of action.

### THIRD CLAIM FOR RELIEF
**(Violations of Section 12(a)(2) of the Securities Act)**

79.     Plaintiffs incorporate by reference the allegations in all other paragraphs.

80.     Defendants have, by engaging in the conduct set forth above, including oral representations that Company's investors had an ownership interest in Lot 13, directly or indirectly, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce, or of the mails: offered or sold securities by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission.

81.     By reason of the foregoing, Defendants have directly or indirectly violated Section 12(a) of the Securities Act. As a result, Plaintiffs have been damaged in an amount to be proven at trial.

## FOURTH CLAIM FOR RELIEF
### (Violations of Section 17(a) of the Securities Act)

82.     Plaintiffs incorporate by reference the allegations in all other paragraphs.

83.     Defendants have, by engaging in the conduct set forth above, including the many misrepresentations regarding celebrity involvement and marketing, directly or indirectly, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce, or of the mails: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon the purchasers of such securities.

84.     By reason of the foregoing, defendants have directly or indirectly violated Section 17(a) of the Securities Act. As a result, Plaintiffs have been damaged in an amount to be proven at trial, and is also entitled to punitive damages, attorney's fees, and costs of suit.

## FIFTH CLAIM FOR RELIEF
### (Violations of C.R.S. 11-51-501 et seq.)

85.     Plaintiffs incorporate by reference the allegations in all other paragraphs.

86.     Defendants have, in connection with the offer, sale, or purchase of any security, directly or indirectly, employed any device, scheme, or artifice, to defraud, made untrue

statements of material fact, and engaged in any practice or course of business which operates or

would operate as a fraud or deceit upon any person.

87.     By reason of the foregoing, Defendants have directly or indirectly violated section

501 the Colorado Securities Act (C.R.S. 11-51-501).

88.     Defendants made all statements contained herein and engaged in the acts,

practices, and the course of conduct set forth herein recklessly with the intent to deceive

Plaintiffs and to induce Plaintiffs to rely on such statements, omissions, acts, practices, and

course of conduct. Plaintiffs justifiably relied upon such statements, acts, practices, and course of

conduct.

89.     In accordance with C.R.S. §§ 11-51-604(3) and 11-51-604(4), Plaintiffs are

entitled to recover damages in an amount to be proven at trial, including actual damages, a

reasonable return on investment, punitive damages, interest at a statutory rate, costs, and

reasonable attorney's fees.

### SIXTH CLAIM FOR RELIEF
**(Unjust Enrichment)**

90.     Plaintiffs incorporate by reference the allegations in all other paragraphs.

91.     Defendants have unjustly retained a benefit to the plaintiff's detriment, and the

Defendants' retention of the benefit violates the fundamental principles of justice, equity, and

good conscience.  Defendants voluntarily accepted a benefit gained from their false and

fraudulent misrepresents, which would be inequitable for them to retain without payment.

92.     By reason of the foregoing, it would be unfair and unjust to allow Defendants to

retain such benefits at the expense of the Plaintiffs. Additionally, by reason of the fraudulent and

otherwise wrongful manner in which the defendants obtained their alleged right, claim or interest

in and to the property, defendants have no legal or equitable right, claim or interest therein, but, instead, Defendants are involuntary trustees holding said property and profits therefrom in constructive trust for Plaintiffs with the duty to convey the same to Plaintiff forthwith.

## SEVENTH CLAIM FOR RELIEF
### (Violation of C.R.S. §§ 18-4-401 *et seq.*)

93.     Plaintiffs incorporate by reference the allegations in all other paragraphs.

94.     Defendants knowingly obtained money belonging to Plaintiff, with the intent to permanently deprive Plaintiffs of the use or benefit of this money.

95.     Defendants were not entitled to personally appropriate or use Plaintiff's money for their own use.

96.     Defendants' conduct has caused damages to Plaintiffs as Plaintiffs do not have possession or use of their money and the interest accrued thereon.

97.     Plaintiffs are entitled to judgment in their favor against Defendants equal to three times the amount Defendants wrongly appropriated or used, plus attorney's fees and court costs.

## EIGHTH CLAIM FOR RELIEF
### (Negligence)

98.     Plaintiffs incorporate by reference the allegations in all other paragraphs.

99.     Defendants owed Plaintiffs a duty of reasonable care when managing the business of the Company. Defendants failed to act reasonably by routinely mismanaging SCRG and its predecessors, and by failing to appreciate the unreasonable risks associated with employing Mitchell Roth as President of SHDC, an individual with little to no experience in corporate governance who was clearly unfit to perform as President of the Company. Defendants knew or should have known that Mitchell Roth was unqualified because he had little to no experience, and likely was only appointed because he is the son of JW Roth. Mitchell Roth's employment

created an unreasonable risk to Plaintiffs, as shareholders of the corporation. Defendants' negligence in hiring Mitchell Roth was a substantial factor in causing Plaintiffs' harm.

100.    By reason of the foregoing, Defendants acted negligently and their conduct was the actual and proximate cause of Plaintiffs' harm.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the Court:

A.     Award Plaintiffs compensatory damages;

B.     Declare that Defendants hold the property known as Lot 13 in a constructive trust for the benefits of Plaintiffs;

C.     Award Plaintiffs pre-judgment and post-judgment interest, together with reasonable attorney's fees, and other costs and expenses; and

D.     Order such other relief as the Court deems proper.

## VII. JURY DEMAND

Plaintiffs request a trial by jury.

Dated:  January 22, 2018

Respectfully submitted,

DLG LAW GROUP LLC

By:     s/ Michael Davis

Michael Davis, #44287
DLG Law Group LLC
4100 E. Mississippi Avenue, Ste. 420
Denver, CO  80246
Tel.:  (303) 758-5100
Fax:  (303) 758-5055
mdavis@dlglaw.net
Counsel for Plaintiff